Thank you very much, Your Honor, and if it pleases the Court, my name is Joseph Aliotto. I represent the plaintiff appellant. If Your Honor pleases, we would like to divide our argument ten minutes for opening, ten minutes for rebuttal, and if Professor Moskowitz might be allowed to give the rebuttal, with your permission. That's fine. If you can stop after ten minutes, he'll have ten minutes. Very good, Your Honor. Thank you very much. As the Court is aware, the issue here is one of statute of limitations, not the merits of the claim. The Court below granted summary judgment in favor of the defendant, and our appeal is with regard to the fact that there are sufficient facts from which a jury can make the determination that, in fact, the statute of limitations had not run. I would like to begin the argument by going directly to the two questions that were asked by the Court on January 12 of this year, after the filings of the brief in which the Court directed us to two principal issues. The first issue was, when, in fact, did the plaintiff have actual knowledge? And that one, I would like to say precisely this, that the particular fraud that constitutes all of the claims that are being made under the SEC Act, under our breach of fiduciary duty, under our Fraud Act, and under our Good Faith, Bad Faith and Fair Dealing Act, and the Negligent Misrepresentation and the Unfair Business Practices Act, all of them come to the issue of when the plaintiff knew. And the plaintiff is an investor. The plaintiff is a divorcee, approximately, I believe, of 55, 60 years old. The only thing she had left was her house after the divorce. She cashed that in, purchased a condominium, and with the rest of the money needed to invest it. And in doing that, the persons with whom she bought her new condominium, her real estate bank, was the one that directed her to invest all of the rest of her money in a brokerage firm, which, by the way, was owned by the bank, and which the brokerage firm paid a commission or a rebate to the person who had suggested to the client that they go and invest their money in this particular account. There were two things that were necessary with regard to the investment. One, the client, not sophisticated, did not know the difference between stock or bonds, made it very plain that unless she could keep her money intact and also generate $15,000 a month for her living expenses, that she wasn't interested. The representations made to her was that this could be done and would be done if she made the investment. When did we actually know that those statements were false? The fact of the matter is that, and so that we get the dates right, the dates that we filed the complaint were July 11, 2003. One year before, in June 2002, these folks told her, different from everything else that they had said, that they were no longer going to do anything for her. That is when she finally went to an attorney, one year before she filed the complaint. Counsel, could I ask you a question? What about inquiry notice, based on the statements where the account was steadily dwindling? She received countless assurances, day in and day out, exactly like the Vucinich case by this circuit. Exactly the same, only more so here. They were more direct. If the court would like to direct the court's attention, for example, to page 11 of our brief, at that time, when the account was going down, she gave this testimony, and this is from the record, of course, page 11 in the bottom of the page. She stated, quote, Robert Vile assured me that this was temporary and stated that within a year or less, the market would recover and my account would be back to 2.2 million. Now, this is a statement of fact. It's not, I hope that it will come back, I think it will come back. This is a statement of fact from someone who's supposed to know, a so-called expert, that, in fact, within that year or less, the account would be back. That, the fact. I was going to say a preliminary issue, I suppose, is does our circuit apply a notice inquiry rule? And as I understand it, a number of other circuits have explicitly said that it's a notice inquiry standard. And then, if that applies, then I suppose there's the question, is she on inquiry when she knows that a representation was made that was false, or is she on inquiry when she knows that something deceitful was done? I think the circuit, Your Honor, has already properly answered the question, because in the Vucinich case, you have a non-sophisticated person. And that's left up to the jury. In the Davis case, you have a sophisticated person. And the standard was harder then. And the whole point of this is, is that in between in these so-called misty flats, as to what is notice or what is inquiry among the various persons, the people who will be protected by these laws, these are really questions of facts. Juries can make the determination. For example, whether it's inquiry notice, actual notice, in my judgment, we think it should be actual in the case of an unsophisticated person for sure, and Vucinich in effect says that. But whether it is actual or whether it is even inquiry notice, isn't that really a question of facts for the jury? The jury could consider, is this person sophisticated or not? Is this an icon person, or is this a person who doesn't know anything about the market? What kind of facts did they get to put the person on notice? Were they the kind of facts that would generate suspicion, or were they more than that? The fact of the matter in this case is that from the very beginning, which, by the way, we did not know, which is interesting, even until after we filed the case, was that from the very beginning they knew with this amount of money that they would not be able to generate the $15,000 a month. We gave this to the court in our brief, and I direct the court's attention to that. That particular part was on page, in our brief, page 14 of our brief. And we quoted from the chairman of the board, the chief executive officer of this defendant, that he said, in looking at the $2.2 million, there is no way you could come up with $15,000 a month. And we directed the court's attention to page 717 of our appendix. And I want to read just one paragraph from there. Now, this is the chairman of the board, and he said at page 94 of his deposition, 84, but it's page 717 of the record in this case, that outlines beginning lines from 13 to 20. He said, if somebody checked off, they're going to be 100 in equity. Equity, as we know, generates probably 2% yield on average. There is no way, no way, there is no way that someone can be 100% in equities and live off the income and preserve the principal. This doesn't make sense. Question, why not? Answer, in a $2 million portfolio, if it's 100% in equity and yielding 2%, that's $40,000 a year. And if she's taking out $15,000 a month, then he goes on, that's far more than she could. They knew from the beginning and did not tell her. And they had already established, they had already established a relationship not only with the bank that gave her the money to buy her property and then sent her to the broker that the bank owned with a rebate or kickback, however it might be described, telling them that these are the experts. These are the people who know. These are the people to trust. Again and again, she says, I don't know, but what is happening? They said, don't worry, not just don't worry about it. They said, don't worry about it. But they said, it's not a promise, it's a statement. Within a year it will be different. So she stuck. And she stuck with them based upon their statement. Their statement was the glue that held her together to them. And it wasn't until they finally said, we're not going to do anything in June of 2002, that at least she knew, okay, this is the wrong place to talk. And it was then found out that obviously in this kind of situation that something was wrong. But again, we knew that there was this substantial deterioration, but it's unusual. We thought, lawyers thought, not her for sure. Lawyers thought, how could it come up with the 15,000? And we get it from the chairman of the board that they knew from the very beginning that the condition that she asked for was impossible to achieve, and they did not tell her. And if they told her, we wouldn't be here. She'd be in real estate or something else. Thank you, Your Honor. All right. All right. The appellees. Thank you, Your Honor. May it please the Court, my name is Sarah Brody, and with me is Alex Lyon. Could you speak somewhat louder into the microphone? Oh, I'm sorry. I should maybe move the microphone. Is that better? It is. It is. Okay. Thank you. My name is Sarah Brody, and with me this morning is Alex Lyon. We represent the defendants and appellees in this case. This argument is not about the merits of the case. This argument is about the issue of statute of limitations. And it is also, it comes to this Court on summary judgment. And unusually so, for this case in summary judgment, the defendant appellees were able to take the facts as pled and as argued by the plaintiff and not have any factual disputes for the purpose of summary judgment. There are no factual disputes in this case. This is a very straightforward timeline story of a situation where someone simply waited much too long to bring their claim. Let me pause on that. I realize she waited quite a while after she had statements showing her account was going down. And, of course, anyone who had money in the equity markets in 2000 or 2001 didn't do well. So she saw her account going down. She was on inquiry notice that a representation that she could get $15,000 per year, or per month rather, which is, I guess, $180,000 a year, without risk, was false, I would think. But does that give her, and this is what bothers me, does that give her notice that there was a fraud, that the company was deceitful? If you accept what the plaintiff argues here, if you accept that the promise on which she relied, on which she now claims is the misstatement, is this alleged oral agreement of a portfolio management agreement that the defendants would manage her account in such a way that they would retain the $2.2 million principal and she would be able to withdraw $15,000 a month and they would not have to touch the principal. Well, no sophisticated investor, I don't believe, would be likely to think they could make between 8 and 9 percent on a portfolio without market risk. You can't do it with CDs. We can only take her allegations as she's made them. So she alleges that that was the promise that was breached that was false. And so having in this situation, we're here on summary judgment. The plaintiff has put together her set of facts, and her set of facts are that that was the promise that was false when it was made. Once the facts are such that you can see that promise is no longer true, we're not disputing whether that was the promise or not for the purpose of this argument. OK, I understand that. But what's bothering me is there is a high level for Sienter on a securities claim. So she either has to show it was intentionally deceitful or with reckless disregard of the truth. And under Silicon Graphics, our precedent, it has to be pleaded. Those elements have to be pleaded with specificity. So how do you answer the concern that she has to be on notice of something other than just a false statement? She has to be on notice that the Sienter element of a securities claim is present. I mean, is that a – is she required to be on notice of that? She has to be on notice of sufficient facts such that she could plead that. And if you take what she has pled as true, which we do for the purpose of summary judgment and for this argument, and you look at the facts that she pleads in her complaint, certainly you could argue maybe the very first account statement, maybe not. But as it goes on and on and on, 15 account statements later, and finally in March of 2001, she has a lunch with an employee of the defendant's who says to her, your account was mismanaged. She doesn't have to get – if you – she doesn't have to get a confession from the defendant, which is what she's arguing. But if you take what she has pled as true, and you look at the facts that she pleads in her complaint,  who says to her, your account was mismanaged. Which is – certainly gives you notice of some sort of negligence. Does it give you notice that you have a securities claim? You do if you are this plaintiff saying that you're relying on this misstatement. The problem in analyzing this case, I think, for most of us, is that this isn't a situation where the plaintiff says simply, you put me in investments I shouldn't have been in because they were riskier than what I wanted. That's part of her case. But really, the heart of her case, and when you listen to the argument so far this morning, and what's been discussed in all the papers, the heart of her case is, you promised me that I could invest this, that I would get $15,000 a month, and that the principal would not be touched. And that's a very specific promise that she claims that she relied on, that she claims was a misstatement at the time it was made. Could I ask you a question? You know, you may well have a case when it goes to a jury that nobody would believe that. But taking it as we now have it, only a very unsophisticated person would have believed that. That's what she says she was. Now, when Judge Elston dealt with our precedent, she actually refers to the plaintiff as a sophisticated investor. That's wrong, is it not? She is not sophisticated on these facts. It depends on which facts about this point if you want to look at. This is contradictory facts. An extraordinarily naive person would believe they could get $15,000 a month out of their investment. We have to assume that she actually believed that. We don't know that. But doesn't that cry out unsophisticated? She also – Will you answer that question? Does it cry out unsophisticated? If, in fact, she believed that, I would say that she was incredibly gullible, but – Well, incredibly gullible. That means not sophisticated. Your Honor, add – Why do you fence with it? Is it sophisticated to believe that or unsophisticated? Answer yes or no. In 1999, many sophisticated investors believed things like that about the market. They believed 9% on – I mean, it's crazy to me. You're right. It is absolutely crazy. I can't believe anybody who had any experience. Now, Judge Elston, for some odd reason, treated her as a sophisticated investor. Did she not? She did, but I don't think you need to do that. Well, she did it. And she granted you summary judgment on the basis she was sophisticated. Now, I'd like to ask you – of course you know I wrote Vucinich. Can you distinguish Vucinich if she's unsophisticated? I can, because in Vucinich, the plaintiff didn't understand the information being provided to them. And is this one different? Yes, it is, because this plaintiff said what she was – this plaintiff said, I understood the bottom line. I understood that my account was going down. Nothing was hidden from her. She got the account statements on a regular basis. She got them more frequently whenever she asked. But she was involved in believing that there'd be a rise. But that doesn't mean that her principle would never be touched. Here, what she tells us is that she believed her principle would never be touched. And it clearly was, and she knew that. Counsel, could I ask you this? What significance, if any, are the assurances that were given to the plaintiff? I don't think that they are of any significance here. When you look at courts that have dealt with that issue, what they say is, you know, once you think someone is not telling you the truth, once you think someone's misleading you, you can't rely upon them to lull you into not acting to protect your interests. Now, you're taking your client and assuming he's lying to her and she should have known. Is that the position? She should have known that the president of the bank was lying to her. Is that your position? She didn't go to the president of the bank until very late in the day. She went to her brokers and she said, I'm worried about my account. Is that your position? The broker was saying that the account might go up. Might. Might. Or will. Not to worry, your account will go up. They were saying what brokers say, not to worry, your account will go up. But the issue is not does the account go up or down. The issue is does what she believes the promise to be that she says she relies on to invest. That's what's unusual about this case. She has this alleged promise that the account is never going to go up. As I say, a sophisticated person would not have believed it for a minute. It cries out unsophisticated. Will you deal with the rebate issue where the bank was paid off by the brokerage? How do you deal with that? The answer to that is quite simple. The .25 percent is standard. It was disclosed in two places in the written documents that she received, that she's never disputed that she received, that have also many other statements in them which completely contradict this alleged oral promise on which she claims that she relies and upon which she says. Well, now, wait a minute. You're not going to argue the facts, are you? No. But I was answering your question. Well, please don't argue a fact. You've got to accept her facts. I accept her facts, and her facts are that she received those documents and that they were available to her and no one hid them from her, and no one, unlike other cases, said to her, you don't need to look at these documents. When you look at what the various courts who have dealt with this issue, I admit the situation when you look at this can appear to be harsh, but you will look at what the Second Circuit did in the Dodds case. In Dodds, the plaintiff is a 45-year-old widow with a 10th-grade education, and she gets invested in limited partnerships, not in Why don't you look at what the Ninth Circuit did, not the Second? In the Ninth Circuit, so far, in Berry and in Livid, the Ninth Circuit has said, we haven't yet decided whether inquiry notice applies, but if we were, we would probably go to the Tenth Circuit articulation of it. I think in looking at the various articulations of inquiry notice, it almost doesn't matter because it's kind of a semantic difference in how you determine Can I go back to Judge Elston's blunder? She refers to her sophisticated. Isn't that a serious mistake in the summary judgment? I don't think it matters in this case because the standard is an objective standard of what a reasonable investor would do. That's not the vicinage standard. But vicinage is a very different fact pattern here, and I think that the courts have made clear since vicinage, respectfully, that it is an objective reasonable investor standard. The other thing is Do you think they overrule vicinage? I don't think that they have directly dealt with vicinage, Your Honor. No, no. That's the standard. But in Berry and in Livid, the courts talk about in both those cases in the Ninth Circuit, although not deciding whether inquiry notice would apply, discussed if it would, they would go to the Tenth Circuit articulation, which applies a reasonable investor standard. The other point here, without arguing the facts, but which is important to put out because it goes to what Judge Elston wrote, is that this particular plaintiff, while saying to everybody she was unsophisticated, if she was not, you know, making — this is not a situation where she's put into highly speculative, and she claims she doesn't know what she's put into, or anybody's hiding information from her. She gets all the information. She gets it more than once a month. She reads it. She testifies she understands the bottom line. She signs her tax returns where she lists her profession as investor. So we don't know if she's sophisticated or not. We could take her articulation of herself as unsophisticated as true, but it doesn't really impact the outcome because even unsophisticated, when you get to this particular timeline, then you realize that by February of 2000, the promise that she claims she relied on is not coming to fruition, that the account balance is going below the principle, and that it continues to go below. And every single month, it drops further down. And she writes in her notes that she's concerned and worried. And then finally, in March of 2001, she has lunch with one of the employees, and they say to her, you're right, this wasn't handled properly. And she writes a thank you note for their honesty. And then she doesn't do anything, and time passes. And she thanked them for their honesty. She surely didn't know they had intentionally deceived her. Well, I think she was thanking that particular employee for being honest about the situation with her. But she doesn't do anything. What is the effect of the assurances she got from the President as compared to the statement made by the real estate agent about the mismanagement of her portfolio? The statement about the mismanagement is by March of 2001. March of 2001. She talks with the President in June of 2002. And he says to her, we're not going to replenish your account. Can I tell me what you're saying? Sorry. She talks to the President of the bank in June of 2002. At this point. And what does he say? He says, we're not going to replenish your account. If she was able to go and ask to have her account replenished, she knew that her promise had not been fulfilled. And then she gets a lawyer in June of 2002, and she waits another year before filing her lawsuit. What did the President tell her other than we're not going to replenish your account? Did he tell her anything else? Not that I'm aware of. And then when her lawyer sends her lawyer at the time sent a demand to the bank in June of 2002, a letter comes back from counsel for the bank saying we're not going to do anything. And she waits another year. So what's interesting about this case is this is not a case where if you apply inquiry notice, you need to agonize about if she found out on day one, did her clock start running on day one? Should she have had a week to do some investigation? Should she have had a month to do some investigation? She waited so long that it is just way past any kind of articulation of the time period. You could argue, I think, very persuasively that she was on notice, and certainly some of the cases that talk about prospectuses that contradict oral assurances, that the prospectuses give notice, she was on notice when she got the first written documents from the bank when she opened her account, that the written documents contradicted this alleged oral promise. She was clearly on notice in February of 2000 when the balance drops below her 2.2. She continues to be on notice. She's on notice in March of 2001. She's on notice in June of 2002, and she doesn't act. Thank you. I'll reserve my remaining two minutes. You said you would reserve it, but normally we have the appellee argues once. So if you want to use it up now, you can. Good morning, Your Honor. Myron Moskowitz for the appellant. I'd like to talk for a minute about the larger implications of this case, if you were to accept the respondent's position in this case. There are thousands of elderly women in America who now have an asset they never had before, and that is the family home that's no longer worth $30,000, $40,000, but it's worth hundreds of thousands of dollars or a million dollars. Women live longer than men. The husband dies, the woman inherits this, and most of them, a lot of them, are like Heidi Betts. They don't know a stock from a bond. They don't need the big house anymore. The husband's gone, the kids are gone. They want to move into a smaller house, an apartment, and do what Heidi Betts did, take the difference and live on it, and they're going to do what she did, go to some type of investment counselor to get help. And unfortunately, there's a lot of sharks out there, and I'm not just talking about people with $2 million worth of home. I have a good friend who's a lawyer in East Oakland, working-class neighborhood, minority people, and even there, the homes are worth $200,000, $300,000, and they're mostly paid off. These people have been living there 20 or 30 years. What's going to happen if you come down with a ruling of the sort they want? They're going to do the same type of thing that happened here, induce these people, trust us, we know the stock market, we know how to invest, you don't, give us your money. All right? Counselor, let me ask you a question. What's your response to opposing counsel's point that the plaintiff listed herself as an investor on her income tax returns? Does that go to the sophistication issue? No, she's an investor. She put $2 million with the defendants. That's an investor. That doesn't mean she knows anything about it. Now, if they want to argue with a jury that makes her sophisticated in light of all this evidence, that she doesn't know what a stock is, she doesn't know what a bond is, she totally trusts everything that the defendants say, let them argue it. That's fine. And if the jury buys it, we lose. But this is summary judgment. I mean, you can't rule, I mean, as Judge Newman was pointing out, the trial court said she's sophisticated in the face of all this evidence. The question isn't what she is, it's what a reasonable jury could find she is. And in this evidence, it seems indisputable. A reasonable jury could find that she's not sophisticated. Let's assume she's not. What do you make of the argument that the appellee makes that the Ninth Circuit has said that if it adopts a notice inquiry standard, the test it would follow should probably be something that the Ninth Circuit said about what would give notice to a reasonable investor? Your Honor, as this Court has said, the whole question of what's a reasonable effort in the statute of limitations is so fact-intensive that summary judgment should rarely be granted. It depends on the individual. What is reasonable notice to Warren Buffett is not going to be reasonable notice to Heidi Betts and any of these thousands of elderly women who don't know a stock from a bond. What I was wondering is whether reasonable investor in that context, if we followed it, means that the investor in their circumstances acts differently. So you cut her more slack than Warren Buffett, or whether it means you take kind of the sort of a skill level of investors. You say a certain skill level is a reasonable investor, and that's what we look to whether that person, when they would have known. Well, let me answer that with an example. If the Court rules the way they want you to rule, you're going to have these investment companies luring people in, and then at the first sign of some kind of a decline in the portfolio, they're going to be sending out voluminous documents that contain somewhere in their disclosure as to what happened. And if they're clever, they're going to put at the top of the document store warnings. All right? And that's going to trigger the statute of limitations. And these people, the Buffetts will read this stuff and they'll know. Heidi Betts isn't. These elderly women who don't know a stock from a bond are not going to be able to frame a proper standard. I suppose that we might adopt a rule saying that for an unsophisticated investor, there has to be actual notice, as some have argued. But let's assume for a minute that we feel there has to be a notice inquiry standard, even for an unsophisticated investor. How would you phrase that standard? I'm not sure you have to in this case. You've already done it to some extent in Vucinich and Davis, making that distinction. This case comes up on summary judgment. All right? The trial judge, Judge Elston, said that she got inquiry notice with the first monthly statement that showed that her portfolio was declining in value. Now, that can't be right. That can't be right, the first statement. What she says with the storm warning. And the effect of that is to say, file suit. You got that? You can file suit for fraud. And as was pointed out, Silicon Graphics says you're going to get sanctioned for that. Right? Rule 11 says you can't file suit where you don't have probable cause. And Silicon Graphics says you don't have probable cause unless you've got firm evidence of fraud. The first statement shows fraud. All it shows is her portfolio is declining. That can't be right. Now, I have the same trouble you do in formulating the language of a rule that would make this distinction. And the best I can come up with is the standard jury instruction that the trial court should give the jury that she has to behave as a reasonable investor and take into account all the evidence in this case that bears on that. That's the best you can do. I mean, how do you define negligence? You can't do much better than that. So I'm sorry. I don't have a clear answer for it. And I'm not sure one can come up with one. But I do know this. If there's anybody Congress intended to protect with the Security and Exchanges Act, it's people like Heidi Betts. It's these people that are totally unsophisticated that are potential victims of these sharks. I'm not saying they're a shark necessarily. That remains for trial. But people are going to take advantage of them. They send out the monthly statement, and, yeah, it contains the information. But then the lady calls up, and what do they tell her? We know what we're doing. This is temporary. We're going to watch your account, and it's temporary. We're taking care of everything. Don't worry about it. That's what they're going to say. And that's exactly what they said in this case. That's what Robert Feil of Traynor-Wortham told Heidi Betts. And that's what they're all going to say. And they're confident they can keep saying it because of statute of limitations. That already happened. That already was triggered by that first notice. And time's going to go by, and the lady doesn't know any better. Finally, she may eventually get to a lawyer, as Ms. Betts did, but it's too late. I mean, that's the kind of ruling they want in this case. And I don't think Congress intended that. If they intended to protect anybody, it's people like Heidi Betts. And to get them to invest in the stock market. This is what makes America strong is to get that money, capital flowing into American companies. They're not going to do it if they think they're going to be victims of these sharks. Thank you, Your Honor. Thank you. We appreciate the arguments of both sides. It's a very challenging case and very well argued on both sides. So thank you.
judges: Noonan, Gould, Rawlinson